Forchelli, Curto, Deegan,
Schwartz, Mineo & Terrana, LLP
333 Earle Ovington Blvd., Suite 1010
Uniondale, New York 11553
Tel. No. (516) 248-1700
Fax No. (516) 248-1729
Gerard R. Luckman
Brian J. Hufnagel

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
In re:                                                                          Chapter 11

SKIP BARBER RACING SCHOOL LLC,                            Case No.

                                   Debtor.
-----------------------------------------------------------X

### DECLARATION OF MICHAEL C. CULVER UNDER LOCAL RULE 1007-2 IN CONNECTION WITH CHAPTER 11 FILING AND IN SUPPORT OF CERTAIN "FIRST DAY" MOTIONS

Michael C. Culver declares pursuant to 28 U.S.C. § 1746 as follows:

### BACKGROUND

1. On May 22, 2017 (the "Petition Date"), Skip Barber Racing School LLC (the "Debtor"), filed a voluntary petition for relief under chapter 11 of titl1 11, United States Code (the "Bankruptcy Code") in this Court. The Debtor is authorized to continue to operate and manage its business and property as a debtor in possession under Bankruptcy Code sections 1107(a) and 1108.

2. I am the chairman, chief executive officer, and managing member of the Debtor. In that capacity I have first-hand knowledge of the facts set forth herein.

**Nature of Debtor's Business and Assets**

3. The Debtor was founded in 1976 by Skip Barber to teach motor racing. The Debtor continues to operate a motor vehicle racing school catering to individuals,

corporate groups, aspiring competitors and race car drivers through its training and racing schools, race series, and corporate events.

4. In December 2001, First Equity Group put an investor group together to acquire assets and assume certain liabilities from the prior owner of the Debtor's business. I became the non-executive chairman at that time.

5. The Debtor's financial difficulties arose due to an inadequate inventory of open wheel race cars to operate profitably. This was exacerbated by the termination of agreements to utilize the Sebring and Road Atlanta tracks by NASCAR.

6. NASCAR acquired Sebring and Road Atlanta approximately 3 years ago. Sebring and Road Atlanta had been owned by Don Panoz. The Debtor has had long term agreements with both tracks.

7. In May 2015. The Debtor and Road Atlanta and Sebring agreed to terms for a new 5 year agreement for track usage and facility leases that replaced prior agreements that were still in place. The agreement was subject to documentation.

8. In April 2016, the agreements were finally formalized. Once executed The Debtor scheduled track and paddock days for Q 4 2016 and early 2017. The agreements called for minimum track days and paddock days at each track: Sebring, 60 track days and 30 paddock days; Road Atlanta 80 track day and 50 paddock days.

9. However, in November 2016, NASCAR terminated the agreements and asked that the Debtor move out of the buildings at Sebring and Road Atlanta within 20 days. It was suggested by Road Atlanta track manager that the Debtor could keep the dates that we had booked if we paid NASCAR $400,000 funds. It did not have the ability to make such payment.

10. Upon termination of the agreements, the Debtor had to reschedule approximately 400 customers that had booked seats at the two locations. This was roughly $800,000 of revenue that was lost or delayed. In late November 2016, The Debtor started an orderly move out of Sebring after receiving an eviction notice. This move was completed satisfactorily. As far as the Debtor understood no eviction notice was served on Road Atlanta and the Debtor assumed that we would work with Road Atlanta to move from 5290 Winder Highway as we had done with Sebring. On or about January 31 or February 1, the sheriff showed up and asked the Debtor's employees to leave the building and everything was moved out of the building by their contractor into the back yard. Damage was done to some of the Debtor's assets and some of the Company's computer servers containing important information was lost.

**The Financing Agreements with People's United Bank and CMS Mezzanine Fund**

11. Michael Culver became the majority interest holder of the Debtor in July 2009, and became Managing Member. At that time the Debtor's debt was owned by an adverse investor, Signature Capital (Sherman Oaks, CA).

12. In January 2011, Mr. Culver found two lenders to refinance the Signature Capital debt and provide capital for operations. CMS Mezzanine Debt Subpartnership ("CMS") invested $3.5 million and on that basis, the Debtor was able to attract Peoples United Bank ("Peoples Bank") to provide a $1 million revolving line of credit, which was a Small Business Administration backed loan.

13. Additionally, in May 2015, Mr. Culver loaned $2 million to the Debtor through a participation agreement with CMS. Previously in 2013, the Debtor retained

Morpheus Capital to raise additional needed funds. Morpheus found an investor that made an offer but it was decided that the proposal would not work for the company.

14. Subsequently, the Debtor retained Regions investment bank to find capital. There was an offer from Tengram which resulted in a letter of intent. Unfortunately, we discovered an accounting error that yielded higher revenues than actual. This stopped the Tengram effort. Regions and the Debtor decided to stop the engagement.

15. In early 2016, Loeb Partners was very interested in representing the Debtor for a capital raise. Unfortunately the Debtor could not come up with the $50,000 retainer. On the insistence of CMS, to which the company agreed, the Debtor interviewed various firms to sell control via new capital coming into the business or sell the company. Several firms were interviewed. Most were too expensive so the decision was made to retain Capital Research Partners.

16. In these various efforts to obtain an equity infusion, the Debtor's leveraged balance sheet inhibited new capital being invested in the Company.

17. Due to its operating difficulties described above, the Debtor was unable to remain current with its payment obligations to Peoples Bank.

18. Peoples Bank commenced litigation against the Debtor in the State Court of Hall County, State of Georgia, and obtained a writ of possession and a temporary restraining order on May 10, 2017 (the "TRO"). Due to the TRO, the Debtor was unable to move vehicles from their storage location in Georgia to racetracks as needed to continue operations. This continues to cost the Debtor business opportunities and to cause resulting losses.

19. The Debtor filed a voluntary petition under chapter 11 on May 22, 2017 so that it could continue to operate while pursuing a sale of its assets. The Debtor intends to reorganize by selling its business as a going concern through an auction process under the supervision of the Bankruptcy Court.

**The Debtor's Liabilities and Assets**

20. The Debtor's main assets include auto parts inventory ($1,600,000, company estimate), vehicles ($1,489,500, FLV at August 24, 2016), and its brand name, goodwill, customer list, and other intangibles ($2,000,000).

21. The Debtor's liabilities are (estimated as schedules have not been finalized) approximately $12.2 million including secured debt of $6.8 million, priority claims comprised of customer deposits of $1.9 million, and general unsecured claims of $3.5 million.

**The First Day Motions**

22. On the Petition Date, the Debtor filed certain "First Day" motions seeking emergency relief. As set forth below, I believe that obtaining the relief requested in each of the First Day motions is critical to avoid irreparable harm to the Debtor, its business, and its prospects for maximizing the value of its business as a going concern.

**Application to Authorize the Debtor to Use Cash Collateral**

23. Through the Debtor's application to use cash collateral, the Debtor seeks to continue the use the cash collateral of People's United Bank. Subject to protections provided for in the proposed order annexed to the application, People's United Bank has consented to such relief.

24. The Debtor's using cash collateral is essential to the continued operation of its business. As described herein, the Debtor intends to pursue a sale of its business on an expedited time frame and requires the use of cash collateral to continue its business operations.

25. Without access to financing and the use of cash collateral, the Debtor cannot pay its essential employees or operating expenses necessary to a successful reorganization. In addition, without use of cash collateral, Debtor will not be able to satisfy its postpetition obligations including customer deposits, which will significantly reduce its value as a going concern. The Debtor requires the use of cash collateral of People's United Bank in order to run day-to-day business operations, and will suffer irreparable harm if it is prevented from doing so.

**Application to Pay Certain Pre-Petition Date Wages,
Salaries, and Related Employee Benefits, and
Directing the Bank to Honor Employee Wage, Salary**

26. The application seeking authority to pay certain pre-Petition Date wages, salaries, and related benefits is critical because the Debtor's employees may stop working if they are not timely paid. The application seeks to pay employees' accrued and unpaid pre- Petition Date wages, salaries, and related benefits, for the period May __, 2017 through and including the Petition Date, in amounts which do not exceed the priority limits set forth in Bankruptcy Code § 507(a)(4). In addition, the application seeks entry of an order directing the Debtor's payroll and human resources administrator, or its bank, to honor employee wage and checks, drawn on the Debtor's payroll account.

27. I believe that there are strong and cogent reasons why the relief requested should be granted. In particular, in order for the Debtor to successfully reorganize its

6

business or maximize its value as a going concern in the event of a sale, it must maintain the loyalty of its employees. Without the relief requested, the Debtor's employees would suffer a tremendous hardship.

28. It is respectfully submitted that any delay in paying the employees' compensation will severely disrupt the Debtor's relationship with its employees, and irreparably harm and/or impair their morale at a time when their dedication, confidence and cooperation is critical. In addition, the prompt payment of wages to the Debtor's employees is necessary to avoid causing personal hardships to those individuals and their families.

**Information Required by Local Rule 1007-2**

29. It is my understanding that Local Rule 1007-2 requires the Debtor to disclose certain information relating to the Debtor's assets, liabilities and financial condition. That information is contained in Exhibit A annexed hereto.

## CONCLUSION

30. The Debtor believes that under the protection of this Court, it will be able to maximize the value of its assets for the benefit of creditors and other stakeholders.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 22, 2017

/s/ Michael C. Culver
Michael C. Culver